UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>

ABEL DURAN,
*on behalf of himself and all others similarly situated*,

          Plaintiff,

    v.

HENKEL OF AMERICA, INC., and HENKEL
CORPORATION,

          Defendants.

</td><td>

19 Civ. 2794 (PAE)

OPINION & ORDER

</td></tr>
</table>

PAUL A. ENGELMAYER, District Judge:

  Plaintiff Abel Duran, a New York resident, brings a putative class action against defendant Henkel Corporation ("Henkel"), a Delaware corporation.[1]  This lawsuit arises from Duran's purchase of one of Henkel's products, Schwarzkop göt2b ultra glued Invincible Styling Gel (the "Product").  Duran takes issue with the Product's label, which advertises "no flakes." He alleges that this label misleads consumers by suggesting that the Product does not produce flakes, when, in fact, it does.  Specifically, Duran brings claims of (1) deceptive and unfair trade practices under New York General Business Law ("GBL") § 349, (2) false advertising under GBL § 350, and (3) New York common law fraud.

  Before the Court is Henkel's motion to dismiss Duran's First Amended Complaint ("FAC") and to strike Duran's class claims.  For the reasons that follow, the Court denies the motion to dismiss Duran's GBL claims; grants that motion as to Duran's fraud claim; and denies, without prejudice, the motion to strike Duran's class claims.

---

[1] Duran voluntarily dismissed his claims against defendant Henkel of America, Inc.  Dkt. 11.

I.      **Background**

A.      **Factual Background**[2]

1.      **Consumer Experiences with the Product**

On November 21, 2018, Duran purchased a six-ounce bottle of the Product at a CVS store in Queens County, New York.  FAC ¶ 17.  The Product's front label included the phrase, "no flakes."  *Id.* ¶¶ 17, 21; *see also id.*, Ex. A (photograph of label).  Duran was persuaded by the label and purchased the Product to avoid the flaky residue that is commonly produced by hair gels.  *See id.* ¶¶ 17, 21.  That same day, Duran showered, dried his hair, and applied two drops of the Product to his hair.  *Id.* ¶ 22.  He later noticed that the Product had produced "white and grayish flakes, similar to that of dried glue."  *Id.*  Duran knows that he did not have flakes in his hair before applying the gel because he had inspected his hair before applying the gel.  *Id.*  His hair also does not naturally have flakes, and natural flakes and gel flakes are visually distinguishable.  *Id.*

Some consumers have published complaints about the Product similar to Duran's on online review boards.  *Id.* ¶ 24; *see also id.*, Ex. B (customer reviews from Amazon and Wal-Mart) ("Reviews").  These reviews complain, *inter alia*, of the following:

- "Poor hold.  Very flaky and crunchy. . . .  [T]his stuff gets very flaky, especially near the end of the day[,]" *id.* ¶ 24; Reviews at 2;

- "A flaky hot mess . . . After it dr[ies] it turns white[;] I real[ly] dislike looking like I have dandruff when I don't[,]" FAC ¶ 24; Reviews at 2;

---

[2] This account is drawn from the FAC, Dkt. 24, its attached exhibits, Dkt. 24-1, and documents that the FAC incorporates by reference.  *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010).  For the purposes of resolving a motion to dismiss, the Court accepts all factual allegations in the FAC as true, drawing all reasonable inferences in plaintiff's favor.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

- "I'm a licensed cosmetologist and I do NOT recommend this product.  This irritated my scalp and caused hair loss in the area.  Initially I did not realize what was happening when my scalp was flaking severely[,]" FAC ¶ 24; Reviews at 2;

- "Too crunchy and flaky.  I find this product to rip my edges out due to the hardness of the product.  It leaves a white, flaky and crunchy residue behind[,]" FAC ¶ 24; Reviews at 3;

- "But be careful it does flake very[,] very bad.  Got some on my hair, and it was huge white flakes[,]" FAC ¶ 24; Reviews at 3;

- "Really flaky.  This gel holds really good but then it gets white and flaky.  If the gel didn't get white and flaky I would give it 5 stars[,]" FAC ¶ 24; Reviews at 3;

- "Not good.  Goopy flaky, would not recommend this at all[,]" FAC ¶ 24; Reviews at 4;

- "[A]ll it did was give me a ton of flakes and nothing held.  It's good for edges though[,]" FAC ¶ 24; Reviews at 4.

Some of the consumers who have complained of flakes have also indicated their satisfaction with the Product.  *See* FAC ¶ 26 (citing Amazon reviews).  Others have acknowledged that the Product causes flaking, but have suggested workarounds, such as using the Product sparingly and not touching one's hair after applying it.  *See id.* ¶ 28 (citing Amazon reviews).

## 2.     The Product's Ingredients

The Product contains the ingredient poly N-vinyl-2-pyrrolidone ("PVP"), a water-soluble polymer commonly used in hair gel.  *Id.* ¶ 30; *see also id.*, Ex. C (back label of Product).  The FAC cites an article by Tonya Becker, a cosmetic scientist, *id.* ¶ 30 (citing Tonya McKay Becker, *The Secret Science of Hair Gel, Revealed*, Naturally Curly (July 10, 2015), https://www.naturallycurly.com/curlreading/kinky-hair-type-4a/the-nitty-gritty-details-about-hair-gel), and a chapter of a book for cosmetic formulators by Bernard Idson, a pharmacy

professor at the University of Texas, *id.* ¶ 31 (citing Bernard Idson, *Polymers as Conditioning Agents for Hair and Skin*, *in Conditioning Agents for Hair and Skin* 251, 259 (Randy Schueller & Perry Romanowski, eds., 1999)), both of which state that PVP can become brittle and flaky in dry weather.[3]  In addition, the FAC excerpts portions of an article from *Cosmetics & Toiletries*, a research and development website for cosmetic chemists, which states that Luviset One, an alternative polymer available to hair gel manufacturers, has demonstrated less flaking than PVP. *Id.* ¶ 34 (citing BASF, *Multifunctional Performance from a New Generation Hair Polymer*, Cosmetics & Toiletries (Sept. 10, 2014), https://www.cosmeticsandtoiletries.com/formulating/category/haircare/Multifunctional-Performance-from-a-New-Generation-Polymer-274506271.html).

The FAC alleges that Henkel intended to mislead consumers by labeling the Product as one that causes "no flakes," when it contains an ingredient, PVP, that is known to produce flakes. *Id.* ¶ 42.  Specifically, it alleges, upon information and belief, that Henkel employs cosmetic scientists who are familiar with PVP's flaking properties and who knew that alternative ingredients are available.  *Id.* ¶ 43.

### 3.    The Product's Price

Duran paid $7.99 for six ounces—or $1.33 per ounce—for the Product.  *See id.* ¶¶ 17, 41. The FAC compares the Product's price to that of three competitors, who allegedly do not make false claims that their gels do not cause flakes:

---

[3] Even if defendants raised a hearsay challenge to these exhibits at trial, that is of no moment now, for inadmissibility is not a basis for dismissal at the motion to dismiss stage.  *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991); *see also Cerni v. J.P. Morgan Secs. LLC*, 208 F. Supp. 3d 533, 540 (S.D.N.Y. 2016) ("[T]he admissibility of documents incorporated in the complaint is irrelevant at the dismissal stage." (citation omitted)).

- Clubman Pinaud Superhold Styling Gel, which costs $6.95 for 16 ounces, or $0.43 per ounce;

- Queen Helene Styling Gel, Hard to Hold, which costs $4.25 for 16 ounces, or $0.27 per ounce; and

- Via Natural Styling Gel Maximum Hold (Crystal), which costs $2.95 for 16 ounces, or $0.18 per ounce.  *Id.* ¶ 41.

The FAC alleges that Henkel charges a price premium for its product, as compared with these competitor hair gels, because of its fraudulent "no flakes" representations.  *See id.* ¶¶ 39–41.  It further claims that, had he known that the Product produced flakes, Duran would not have bought the Product or would have only paid significantly less for it.  *Id.* ¶ 17.  Instead, he paid full price for the Product and received a product inferior to what was promised by Henkel.  *Id.* ¶ 39.

### B.   Procedural History

On March 28, 2019, Duran filed his initial complaint against Henkel Corporation and Henkel of America, Inc., Dkt. 1, and then refiled his initial complaint with exhibits, Dkt. 2.  On May 1, 2019, Duran voluntarily dismissed his claims against Henkel of America, Inc.  Dkt. 11.  On June 7, 2019, Henkel filed a motion to dismiss Duran's initial complaint.  *See* Dkts. 16–18.  On June 10, 2019, the Court ordered Duran to amend his complaint or oppose Henkel's motion to dismiss.  Dkt. 20.

On July 3, 2019, Duran filed the FAC, the operative complaint here, with attached exhibits.  Dkt. 24.  On July 26, 2019, Henkel filed its motion to dismiss the FAC, Dkt. 27-1, accompanied by a memorandum of law, Dkt. 27 ("Def. Mem."), and the declaration of Keith E. Smith, Esq., Dkt. 27-2 ("Smith Decl."), and attached exhibits.  On August 9, 2019, Duran filed

his opposition, Dkt. 28 ("Pl. Mem."), along with a declaration from C.K. Lee, Esq., Dkt. 29

("Lee Decl."), and an attached exhibit.  On August 23, 2019, Henkel filed its reply, Dkt. 32

("Def. Reply"), along with a reply declaration from Keith E. Smith, Esq., Dkt. 33 ("Smith Reply

Decl."), and an attached exhibit.

## II.     Discussion

First, Henkel argues that the FAC should be dismissed because Duran has failed to state a

claim for relief under GBL §§ 349 or 350 for deceptive and unfair trade practices or under New

York common law for fraud.  Henkel then argues that Duran's claims for injunctive relief, at

least, should be dismissed for lack of standing.  Finally, Henkel moves to strike Duran's class

claims.  The Court addresses these four issues in turn.

### A.     Motion to Dismiss Under Rule 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a

complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell

Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim will only have "facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a

complaint, however true, could not raise a claim of entitlement to relief."  *Twombly*, 550 U.S.

at 558.

For the purpose of resolving a motion to dismiss, the Court must assume all well-pled

facts to be true, drawing all reasonable inferences in favor of the plaintiff.  *See Koch*, 699 F.3d

at 145.  That tenet, however, "is inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678.  A

pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a

cause of action will not do."  *Twombly*, 550 U.S. at 555.

6

### 1.    GBL §§ 349 and 350 Claims

The FAC brings claims for deceptive and unfair trade practices under GBL §§ 349 and 350.  Henkel challenges these for failure to state a claim under Rule 12(b)(6).

#### a.    Applicable Legal Principles

GBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in the state of New York.  N.Y. Gen. Bus. Law § 349(a).  In addition, § 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service" in the state.  *Id.* § 350.

To state a claim under GBL § 349, a plaintiff must allege that "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000) (per curiam).  "The standard for recovery under General Business Law § 350, while specific to false advertising, is otherwise identical to Section 349." *Denenberg v. Rosen*, 897 N.Y.S.2d 391, 395 (1st Dep't 2010) (quoting *Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324 n.1 (2002)).  Given this overlap, "courts have found that the scope of § 350 is as broad as that of § 349 . . . and that its essential elements are the same." *Braynina v. TJX Cos.*, No. 15 Civ. 5897 (KPF), 2016 WL 5374134, at *4 (S.D.N.Y. Sept. 26, 2016) (internal citation omitted); *see also Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (treating the two causes of action the same); *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (2012) (same).  Claims under GBL §§ 349 and 350 are not required to meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b), discussed in detail below. *Lugones v. Pete & Gerry's Organic, LLC*, No. 19 Civ. 2907 (KPF), 2020 WL 871521, at *7 (S.D.N.Y. Feb. 21, 2020).

b.      *Application*

Henkel argues that the FAC's GBL claims should be dismissed because the FAC fails to allege the last two elements: that the Product's label was materially misleading and that Duran was injured as a result.

i.      Materially Misleading

Henkel argues that the Product's label was not materially misleading principally because the "no flakes" representation is non-actionable puffery. *See* Def. Mem. at 8–10. The Court disagrees.

In assessing whether an act is materially misleading, the inquiry is whether, objectively, the act is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 26 (1995)); *see also Orlander*, 802 F.3d at 300. While it is possible for a court to decide this question as a matter of law, *see Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013), this inquiry is generally a question of fact not suited for resolution at the motion to dismiss stage, *see Buonasera v. Honest Co.*, 208 F. Supp. 3d 555, 566 (S.D.N.Y. 2016) (whether labels on hair care products were misleading under GBL §§ 349–50 was question of fact to be resolved by jury); *see also, e.g.*, *Eidelman v. Sun Prods. Co.*, No. 16 Civ. 3914 (NSR), 2017 WL 4277187, at *3 (S.D.N.Y. Sept. 25, 2017) (collecting cases); *Kacocha v. Nestle Purina Petcare Co.*, No. 15 Civ. 5489 (KMK), 2016 WL 4367991, at *14 (S.D.N.Y. Aug. 12, 2016) (same).

Puffery, however, is a defense that presents an exception to that normal rule. Statements that are mere puffery cannot support a claim under GBL §§ 349 or 350, and thus "[c]ourts can

determine that a statement is puffery as a matter of law."[4]  *Lugones*, 2020 WL 871521, at *8

(citation omitted).  "Puffery is an exaggeration or overstatement expressed in broad, vague, and

commendatory language."  *Kacocha*, 2016 WL 4367991, at *16 (quoting *Castrol Inc. v. Pennzoil

Co.*, 987 F.2d 939, 945 (3d Cir. 1993)); *see also Time Warner Cable, Inc. v. DIRECTV, Inc.*,

497 F.3d 144, 159 (2d Cir. 2007).  These exaggerated statements "make no specific claims on

which consumers could rely," *Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 528 n.14

(S.D.N.Y. 2003); they are "[s]ubjective claims about products, which cannot be proven either

true or false."  *Time Warner Cable*, 497 F.3d at 159 (alteration in original) (quoting *Lipton v.

Nature Co.*, 71 F.3d 464, 474 (2d Cir. 1995)).

The FAC bases its claims on the Product's front-label representation that it produces "no

flakes."  *See* FAC ¶ 21.  The front label also states that the Product is "non-sticky" and has a

"crazy hold."  *Id.*, Ex. A (front label).  Henkel argues that these representations ("non-sticky – no

flakes – crazy hold") are "precisely the type of generalized, exaggerated claim[s] that constitute

puffery."  Def. Mem. at 9.  It compares these statements to those in *In re Scotts EZ Seed

Litigation*, where the district court held that defendants' representations that its EZ Seed product

was "WaterSmart" and "Drought tolerant" and that it "Grows Anywhere!  Guaranteed!"; "Makes

the Most Of Every Drop!"; and "Grows in Tough Conditions!  Guaranteed!" were non-

actionable puffery.  No. 12 Civ. 4727 (VB), 2013 WL 2303727, at *7 (S.D.N.Y. May 22, 2013).

But the Product's "no flakes" representation, unlike those highlighted by Henkel in *In re

Scotts EZ Seed Litigation*, is not exaggerated and vague.  Instead, it is more comparable to other

representations at issue in that same case: that EZ Seed grows grass "50% thicker with half the

---

[4] Puffery, similarly, will not support a common law fraud claim.  *See Cohen*, 25 F.3d at 1172;
*Lugones*, 2020 WL 871521, at *10; *EED Holdings v. Palmer Johnson Acquisition Corp.*,
387 F. Supp. 2d 265, 276 (S.D.N.Y. 2004).

water" compared to "ordinary seed," and is "developed to thrive in virtually every condition—
harsh sun, dense shade, and even spreads to repair wear and tear." *Id.*  The court found that these
statements were actionable because they "promise[d] that EZ Seed will perform in specific,
measurable ways." *Id.*  The same is true here.  The "no flakes" statement is a specific and
testable representation that the Product will not cause flaking in a user's hair.  It falls easily
within the realm of statements that can be proven true or false. *See Lugones*, 2020 WL 871521,
at *9 (statement on egg container that "[m]ost hens don't have it as good as Nellie's. . . .  Our
hens can peck, perch, and play on plenty of green grass" was not puffery, but factual claim that
defendant's hens had more access to the outdoors and better lives); *cf. Kacocha*,
2016 WL 4367991, at *16–17 (defendant's advertisements for dog treats—specifically, its
references to the treat's bacon flavor, use of the terms "Beggin" and "BacoNology," and use of a
"a cartoon dog salivating while reaching for a crispy piece of bacon"—were not puffery as to the
bacon content of such treats).

The Product's "no flakes" representation is similar to statements in other cases involving
hair products that have been held not to be puffery.  For example, in *In re Amla Litigation*,
plaintiffs, consumers of a L'Oreal hair relaxing product, claimed they had relied on the product's
packaging—which, *inter alia*, advertised that the product was a "rejuvenating ritual"; "rich in
vitamins and minerals"; "[r]efills to reveal visibly fuller, silkier hair"; "[r]efills as it relaxes for
amazingly lively-looking hair"; "anti-breakage"; "intense conditioning"; "protects scalp & skin"
and "infuses hydration & conditioning"—in believing the product would safely straighten their
hair, when in fact the product caused burning, skin irritation, and hair loss. *Manier v. L'Oreal
U.S.A., Inc.* (*In re Amla Litig.*), Nos. 16 Civ. 6593, 17 Civ. 111 (JSR), 2017 U.S. Dist.
LEXIS 116139, *8–9, 27–28 (S.D.N.Y. July 17, 2017).  The court held that these representations

were not puffery, but could be understood to mean that the hair relaxer was gentler and less caustic than others on the market. *Id.* at *28. It also noted that representations that the product was supposed to "protect[] scalp & skin" and create "amazingly lively-looking hair" presented specific, verifiable claims. *Id.*; *see also Reid v. Unilever U.S., Inc.*, 964 F. Supp. 2d 893, 908 (N.D. Ill. 2013) (representation that hair product was "smoothing" was not puffery, because it could "be viewed as a statement that 'conjure[s] a specific, factual idea' about the Hair Treatment's effects in the mind of a typical consumer" (citation omitted)). Similarly, here, a reasonable consumer could interpret the "no flakes" representation to mean the Product is not flaky like other hair gels. Far from puffery, this is a testable binary proposition—the gel either leads to flaking, or it does not.

Henkel argues that when viewing the "no flakes" representation in the context of the Product's full label, a reasonable consumer would know that the representation was mere puffery. Def. Mem. at 9–10. For support, it points to the Product's front-label description— "invincible styling gel"—and the Product's back label, which Henkel characterizes as "editorialized" and "hyperbolic":

> This gel's hold is no joke! So put it down and slowly back away if you are not up for our strongest gel hold ever!
>
> This non-sticky, no-flake formula is powered by a high-tech styling agent—we call it Alpha XTR. Call it what you want, it lets you take your hair to new heights. Or do your own thing and cement your individual style.
>
> And when the party comes to an end, easily un-glue with a little shampoo.
>
> Go ahead—style away!

Smith Decl., Ex. A (photograph of Product's front and back label).[5]

Henkel is correct that courts assess each potentially misleading statement in light of the context of a product's full label. *See Lugones*, 2020 WL 871521, at *8 ("Courts view each allegedly misleading statement in light of its context on the product label or advertisement as a whole." (quoting *Belfiore v. Proctor & Gamble Co.*, 311 F.R.D. 29, 53 (E.D.N.Y. 2015)). However, that some statements on the Product's packaging may be closer to puffery does not render the "no flakes" representation puffery. Courts often find that some statements on a product's label, packaging, or advertisements are puffery, while others are not. *See, e.g.*, *Lugones*, 2020 WL 871521, at *9 (statements that "WE LOVE OUR HENS, YOU'LL LOVE OUR EGGS" and "BETTER LIVES FOR HENS MEAN BETTER EGGS FOR YOU" were puffery, while statement that "[m]ost hens don't have it as good as Nellie's. . . . Our hens can peck, perch, and play on plenty of green grass" was not); *In re Scotts EZ Litig.*, 2013 WL 2303727, at *7 (statements that EZ Seed is "WaterSmart"; "Drought tolerant"; "Grows Anywhere! Guaranteed!"; "Makes the Most Of Every Drop!"; and "Grows in Tough Conditions! Guaranteed!" were puffery, while statements that EZ Seed grows grass "50% thicker with half the water" compared to "ordinary seed" and is "developed to thrive in virtually every condition—harsh sun, dense shade, and even spreads to repair wear and tear" were not).

---

[5] The photograph of the Product's back label is attached to Henkel's Smith Declaration. The Court considers this photograph, because Duran attached the Product's front label and a portion of its back label to the FAC, and the Product's packaging is integral to the FAC. The full back label is relevant to the claims here—which are based on representations on the Product's packaging and must be analyzed in the full context of such packaging—and there does not appear to be a dispute as to the accuracy of the photograph of the back label attached to the Smith Declaration. *See DiFolco*, 622 F.3d at 111 (explaining that court can consider, on motion to dismiss under Rule 12(b)(6), documents integral to the complaint, where those documents are relevant and there is no dispute as to their accuracy or authenticity).

Further, the context of the "no flakes" representation—a factual representation in the center of the Product's front label—suggests that it is a statement on which a reasonable consumer could rely. *Cf. Ackerman v. Coca-Cola Co.*, No. 09 Civ. 395 (JG), 2010 WL 2925955, at *16 (E.D.N.Y. July 21, 2010) (sugar content on nutritional label did not "as a matter of law extinguish the possibility that reasonable consumers could be misled" to think vitaminwater-branded beverage had no sugar because "[r]easonable consumers should [not] be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box" (alteration in original) (quoting *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939–40 (9th Cir. 2008)). The Court therefore holds that the Product's "no flakes" representation is not puffery.

Even setting aside the puffery analysis, the Court cannot determine as a matter of law that no reasonable consumer could be misled to believe that the Product caused no flakes. As noted, dismissal on a Rule 12(b)(6) motion is often not appropriate where doing so would require assessing how a reasonable consumer would respond to particular representations. *See, e.g.*, *Eidelman*, 2017 WL 4277187, at *4 ("Notably, whether an interpretation is unreasonable as a matter of law is generally reached at this stage only where, for instance, a plaintiff's claims as to the impressions that a reasonable consumer might draw are 'patently implausible' or unrealistic." (citation omitted)). And the Product's "no flakes" representation is similar to many others that courts in this Circuit have declined to dismiss. *See, e.g.*, *id.* at *2–4 (declining to dismiss claim based on laundry detergent's label—which stated that it was "from the #1 Detergent Brand Recommended by Dermatologists for Sensitive Skin"—because reasonable consumer could be misled to think that actual detergent at issue was recommended by dermatologists for those with sensitive skin); *Buonasera*, 208 F. Supp. 3d at 559, 565–66 (same for hair products advertised as

13

"natural" and containing "no harsh chemicals (ever!)"—when there were allegedly synthetic and toxic ingredients in such products—because reasonable consumer could be misled to think hair products were all-natural); *Kacocha*, 2016 WL 4367991, at *15–16 (same for dog treat heavily branded with bacon-related items, including treat's scent and appearance, commercial's references to "bacon" and "beggin'," and package's prominent depiction of bacon, because reasonable consumer could be misled to think that treat was "predominantly made out of real pork bacon"); *Stoltz v. Fage Dairy Processing Indus., S.A.*, No. 14 Civ. 3826 (MKB), 2015 WL 5579872, at *14–21 (E.D.N.Y. Sept. 22, 2015) (same for "Total 0%" language on yogurt's label, which was meant to show that yogurt was non-fat, but reasonable consumer could be misled to think "Total 0%" referenced ingredients other than fat content, *e.g.*, calories, carbohydrates, or sugar); *Segedie v. Hain Celestial Grp., Inc.*, No. 14 Civ. 5029 (NSR), 2015 WL 2168374, at *10–12 (S.D.N.Y. May 7, 2015) (same for labels touting products as "natural" or "all natural" because reasonable consumer could be misled to think these products contained only natural ingredients, even though organic foods can contain some synthetic ingredients and products' label listed synthetic ingredients); *Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 287–88 (S.D.N.Y. 2014) (same for milk carton's statement that it was "Fat Free Milk and Omega-3s"—despite other representations on the carton that disclosed fat content—because reasonable consumer could be misled to think the milk contained no fat).  The Court therefore declines to dismiss the FAC's GBL claims based on the materially misleading element.

     ii.  Injury

   Henkel also argues that the FAC has failed to allege injury, the final element needed for GBL §§ 349 and 350 claims.  *See* Def. Mem. at 12–14; Def. Reply at 5–7.  In response, Duran contends that the FAC has adequately pled a price premium theory of injury.  *See* Pl. Mem.

14

at 8–13.  The Court agrees with Duran.

"An actual injury claim under [s]ection[s] 349 [and 350] typically requires a plaintiff to 'allege that, on account of a materially misleading practice, she purchased a product and did not receive the full value of her purchase.'"  *Daniel v. Mondelez Int'l, Inc.*, 287 F. Supp. 3d 177, 195 (E.D.N.Y. 2018) (alterations in original) (quoting *Izquierdo v. Mondelez Int'l Inc.*, No. 16 Civ. 4697 (CM), 2016 WL 6459832, at *7 (S.D.N.Y. Oct. 26, 2016)).  A plaintiff can show this injury by alleging "an overpayment, or 'price premium,' whereby a plaintiff pays more than she would have but for the deceptive practice."  *Izquierdo*, 2016 WL 6459832, at *7; *see also Orlander*, 802 F.3d at 302 (acknowledging price premium theory in consumable goods cases, where plaintiffs alleged they paid more for goods than they would have but for defendants' deceptive practices).

To allege injury under a price premium theory, a plaintiff must allege not only that defendants charged a price premium, but also that there is a "connection between the misrepresentation and any harm from, or failure of, the product."  *DaCorta v. AM Retail Grp.*, No. 16 Civ. 1748 (NSR), 2018 WL 557909, at *7 (S.D.N.Y. Jan. 23, 2018) (quoting *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 56 (1999)).  This connection often takes the following form:  A plaintiff alleges that a company marketed a product as having a "unique quality," that the marketing allowed the company to charge a price premium for the product, and that the plaintiff paid the premium and later learned that the product did not, in fact, have the marketed quality.  *See id.* at *8; *see also, e.g.*, *Kacocha*, 2016 WL 4367991, at *14 (price premium based on advertised bacon content of dog treat); *Segedie*, 2015 WL 2168374, at *12 (price premium based on "natural" or "all natural" quality of product); *Weisblum v. Prophase Labs, Inc.*, 88 F. Supp. 3d 283, 292–93 (S.D.N.Y. 2015) (price premium based on Cold-EEZE Lozenges'

advertised effectiveness in reducing cold symptoms); *Goldemberg*, 8 F. Supp. 3d at 480–82 (price premium based on "Active Natural" labeling of product); *Ebin v. Kangadis Food Inc.*, No. 13 Civ. 2311 (JSR), 2013 WL 6504547, at *4–5 (S.D.N.Y. Dec. 11, 2013) (price premium based on "100% Pure Olive Oil" label on olive oil).

The FAC has alleged a price premium connected to Henkel's "no flakes" representation. It alleges that Henkel was able to charge the premium price of $7.99 for a six-ounce bottle of the Product *because* Henkel had represented that the Product has the unique quality of creating no flakes. *See* FAC ¶ 41 ("Defendant's deceptive misrepresentation allowed them to charge a premium that would not have been possible had their representations been truthful."); *see also id.* ¶¶ 7, 17, 39–41. It further alleges that Duran and other consumers paid full price for the Product but received something inferior to what Henkel had promised, *id.* ¶¶ 39–40, and that, had Duran known that the Product produced flakes, he would not have purchased the Product, or would have only paid significantly less for it, *id.* ¶ 17. This suffices to allege a price premium theory of injury.

Henkel makes two main arguments in response. First, it faults the FAC's use of comparator products. *See* Def. Mem. at 12–13. Second, it argues that its customers are satisfied with the Product. *See id.* at 13–14. Both of these arguments can be set aside.

First, to support its price premium theory, the FAC compares the Product's price of $1.33 per ounce of hair gel with the prices of three competitors that Duran alleges "do not make false and deceptive 'no flakes' representations." FAC ¶ 41. These three competitor gels are Clubman Pinaud Superhold Styling Gel, priced at $0.43 per ounce; Queen Helene Styling Gel, Hard to Hold, priced at $0.27 per ounce; and Via Natural Styling Gel Maximum Hold (Crystal), priced at $0.18 per ounce. *Id.* To weaken the FAC's theory, Henkel argues that the back labels of all

three gels indicate that they do not flake and that each contains PVP, the chemical that the FAC

alleges causes flaking.  *See* Smith Decl., Ex. B (photographs of Clubman Pinaud and Queen

Helene labels); Smith Reply Decl., Ex. 1 (photograph of Via Natural label).

Henkel argues that the Court should consider its exhibits of the labels for the competitor

hair gels because such labels are integral to the FAC.  Def. Mem. at 12 n.4.  On a motion to

dismiss, courts may be able to consider documents that are not incorporated by reference or

attached to a complaint if such documents are integral to the complaint, meaning the complaint

"relies heavily" on their "terms and effect."  *DiFolco*, 622 F.3d at 111 (quoting *Mangiafico v.*

*Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).  Courts can only do so, however, if there are "no

material disputed issues of fact regarding the relevance of the document," and it is "clear on the

record that no dispute exists regarding the authenticity or accuracy of the document."  *Id.*

(quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)).

The Court declines to consider the Via Natural label.  The FAC does not incorporate by

reference or attach photographs of any of the competitors' labels.  It is a close question whether

the FAC relies *heavily* on the competitor labels.  The FAC does claim that the competitors "do

not make false and deceptive 'no flakes' representations," making clear that it is relying on the

labeling and packaging of such products.  FAC ¶ 41.  But although all three labels are clearly

relevant and Duran does not appear to dispute the accuracy of the Clubman Pinaud and Queen

Helene labels, *see* Pl. Mem. at 10–11, it is not clear from the record that the Via Natural label is

accurate and authentic.  This is because Henkel attached the Via Natural label to the Smith Reply

Declaration, which accompanied its reply memorandum, *see* Smith Reply Decl., Ex. 1; as a

result, Duran did not have an opportunity to comment on its accuracy.  Therefore, it is not clear

on this record that there is no dispute as to the authenticity and accuracy of that label.

In any event, even considering the back-label representations that Club Pinaud gel is "non-flaking" and Queen Helene gel is "never flaky," *see* Smith Decl., Ex. B at 3, 5, the FAC has still alleged sufficient facts to show injury. Although plaintiffs sometimes point to comparators in support of a price premium claim, *see, e.g.*, *Ebin*, 2013 WL 6504547, at *1 (comparing 16.3 cents per fluid ounce charged by defendant to 9.8 cents per fluid ounce charged by competitor), a plaintiff is not required to do so in order to allege injury. *See Goldemberg*, 8 F. Supp. 3d at 482 ("[W]hile identifying the prices of competing products in the Complaint would strengthen Plaintiff's allegation of injury . . . , the failure to do so is not fatal to Plaintiff's claim." (internal citation omitted)); *see also, e.g.*, *Koenig*, 995 F. Supp. 2d at 288 (complaint sufficiently alleged injury via price premium theory without alleging comparators). And even when comparators are alleged, they do not have to be "precisely comparable product[s]," and the "actual comparability" of such products is a factual determination not appropriate for a motion to dismiss. *Greene v. Gerber Prods. Co.*, 262 F. Supp. 3d 38, 69 (E.D.N.Y. 2017). Here, the FAC has alleged more than is necessary by pointing to potential comparable products. The persuasive weight to be assigned to these comparators—including, for example, the fact that the Club Pinaud and Queen Helene representations are only on the back label, unlike the Product's "no flakes" representation on the front—are questions to be addressed, by the Court or a jury, at a later stage. Henkel's arguments to undermine the comparators are not sufficient to warrant dismissal for lack of injury.

Second, Henkel argues that consumers are not paying a price premium for the Product because they are satisfied with it. To support its argument, Henkel points to parts of the reviews cited by the FAC, *see* Def. Mem. at 14 (noting one review, which stated that "[i]t is amazing gel (glue) for the price," *see* FAC ¶ 28, and another that stated, "Love this gel! However it does

18

flake a lot," *id.*), and the full set of Amazon reviews for the Product, which it attached to the Smith Declaration, *see* Smith Decl., Ex. D.  This argument fails.  First, the Court declines to consider this full set of reviews, whose accuracy Duran disputes.  *See* Lee Decl., Ex. A.  Second, even crediting that some consumers are satisfied with the Product does not mean that Henkel is not charging a price premium for the "no flakes" representation, especially when drawing all inferences in Duran's favor.

The Court therefore finds that the FAC has alleged sufficiently injury and declines to dismiss the GBL §§ 349 and 350 claims for failure to state a claim.

> **2.  Fraud**

In addition to its GBL claims, the FAC also brings a claim of fraud under New York common law.  Like the GBL claims, Henkel challenges the fraud claim under Rule 12(b)(6).

> *a.    Applicable Legal Principles*

In evaluating whether a complaint alleging fraud states a claim, the Court applies Federal Rule of Civil Procedure 9(b).  That rule provides that where "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Rule 9(b) "requires that the plaintiff '(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent.'"  *Eternity Glob. Master Fund, Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir. 1996)).

Although Rule 9(b) contains a heightened particularity standard, it also relaxes the standard for pleading fraudulent intent:  "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  The Second Circuit, however, has cautioned that because "we must not mistake the relaxation of Rule 9(b)'s specificity

requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations[,] . . . plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (alteration in original) (quoting *Acito v. IMCERA Grp.*, 47 F.3d 47, 52 (2d Cir. 1995)). Such a "strong inference" can be established either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 290–91 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)). To determine if the "strong inference" requirement is met, a court should "consider the complaint in its entirety and take into account plausible opposing inferences." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (internal quotation marks and citation omitted). If the inference is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged," then it is sufficiently strong. *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)).[6]

Under New York law, a common law fraud claim must plead the elements of fraud and satisfy Rule 9(b)'s heightened pleading standard. *See Matana v. Merkin*, 957 F. Supp. 2d 473, 484 (S.D.N.Y. 2013). As to the elements for fraud, a plaintiff must allege: "(1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages." *Loreley*, 797 F.3d at 170 (citing *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009)).

---

[6] Although the Supreme Court's discussion in *Tellabs* addressed inferences of scienter under securities fraud statutes and thus "does not directly control this case," this guidance is nonetheless helpful in assessing when a "strong inference" of fraudulent intent arises in connection with a common law fraud claim. *See Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 451 n.5 (S.D.N.Y. 2007).

b.      *Application*

Henkel argues that the fraud claim should be dismissed because the FAC fails to allege fraudulent intent.  *See* Def. Mem. at 14–16; Def. Reply at 7–8.  Although this is a close question, the Court finds that the FAC has not alleged sufficient facts to give rise to a strong inference of fraudulent intent.

The FAC meets the particularity requirements of Rule 9(b).  It alleges that (1) the fraudulent statement that the Product causes "no flakes"; (2) this misrepresentation was made by Henkel; (3) the misrepresentation was on the Product's label when Duran purchased it on November 21, 2018 and throughout the class period; and (4) the misrepresentation was fraudulent because the Product did in fact produce flakes.  *See, e.g.*, FAC ¶¶ 2–7, 17.

The issue here is not particularity, but whether the FAC meets Rule 9(b)'s standard for pleading fraudulent intent.  The FAC's allegations of fraudulent intent are as follows.  The FAC contends that the Product contains PVP, and that PVP tends to produce flakes.  *Id.* ¶ 30.  As support, it points to articles by cosmetic scientist Tonya Becker and pharmaceutical professor Bernard Idson that discuss PVP's tendency to cause flaking during dry weather.  *Id.* ¶¶ 30, 31.  It also points to an article from *Cosmetics & Toiletries*, a research and development website geared to cosmetic scientists, that details PVP's development in the 1950s and its flaking propensities, and highlights an alternative hair gel ingredient that leads to lower flaking than PVP.  *See id.* ¶ 34.  The FAC further alleges that "upon information and belief," Henkel employs scientists, who are familiar with PVP and its flaking propensity, in addition to other ingredients that could fulfill the Product's "no flaking" promise.  *Id.* ¶ 43.  Because the Product contained PVP, an ingredient known to cause flakes, and Henkel nonetheless advertised the Product as a no-flakes hair gel, the FAC alleges that Henkel intended to mislead consumers in order to boost its sales. *Id.* ¶ 42.

These allegations are not sufficient to raise a strong inference of fraudulent intent.  While fraudulent intent can be alleged generally, it must be supported with sufficient facts to raise a strong inference of fraudulent intent, either by showing that defendants have a motive and opportunity for fraud or by demonstrating strong circumstantial evidence of conscious misbehavior or recklessness.  *Lerner*, 459 F.3d at 290–91.  First, the FAC attempts to allege that Henkel had a motive for fraud:  Henkel wanted to boost sales.  FAC ¶ 42.  However, simply alleging a defendant's self-interested desire to increase sales does not give rise to an inference of fraudulent intent.  *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) (general corporate profit motive does not establish scienter); *In re Frito-Lay N. Am, Inc. All Natural Litig.*, No. 12 MD 2413 (RMM), 2013 WL 4647512, at \*25 (E.D.N.Y. Aug. 29, 2013) ("Frito-Lay's generalized motive to satisfy consumers' desires, [and] increase sales and profits, 'does not support a strong inference of fraudulent intent.'" (citation omitted)).

Whether the FAC alleges strong circumstantial evidence of conscious misbehavior or recklessness is a closer question.  The closest the FAC comes to alleging this evidence is a general allegation that, "upon information and belief," Henkel employs cosmetic scientists who are aware of PVP's properties.  FAC ¶ 43.  Although a party can plead fraudulent intent based on information and belief where the knowledge is uniquely within the defendant's control, this must be supported by additional specific facts to give rise to fraudulent intent.  *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990) ("Where pleading is permitted on information and belief, a complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard.").  The FAC's general allegation regarding unnamed cosmetic scientists does not rise to the level of specific facts necessary to support an inference of fraudulent intent.  *See Quiroz v. Beaverton Foods, Inc.*, No. 17 Civ. 7348 (NGG),

22

2019 WL 1473088, at *10–11 (E.D.N.Y. Mar. 31, 2019) (no fraudulent intent where complaint alleged that "Defendant knew that its 'No Preservatives' label was false because '[u]pon information and belief, Defendant employs food scientists who are familiar with the basic properties of citric acid' and '[t]hus, Defendant knew that citric acid was a preservative'").  It does not, for example, allege facts to support that any particular corporate officer—let alone a particular scientist—was aware that PVP caused flaking, knew PVP was an ingredient of the Product, and marketed the Product as a "no flakes" product anyway.  *Cf. Ebin*, 2013 WL 6504547, at *6 (fraudulent intent sufficiently alleged where complaint alleged that advertising product as "100% Pure Olive Oil" violated all applicable labeling standards and defendant corporation's vice president was aware of these standards because he tried and failed to prevent Connecticut from banning olive oil that did not comply with the standards).  Nor does it present specific facts to support these scientists' knowledge of PVP's alleged flaking properties.  While the FAC points to articles that discuss PVP's flaking propensities, *see* FAC ¶¶ 30–31, 34, it does not allege facts to show that the cosmetic scientists were aware of these particular articles or their content.  *See Greene*, 262 F. Supp. 3d at 73–74 (fraudulent intent sufficiently alleged where defendant sponsored study that contradicted its health claims and had corresponded with FDA about how to cabin its health claims to avoid deceiving consumers); *cf. Hughes v. Ester C Co.*, 930 F. Supp. 2d 439, 473 (E.D.N.Y. 2013) (fraudulent intent sufficiently alleged where complaint pointed to evidence that, despite its advertising to the contrary, defendant's product did not provide support for one's immune system, including FTC investigations into representations by its competitors that their similar products boosted immune systems and a study disputing such claims).

Without more specific facts, the FAC does not support the inferential chain needed to yield fraudulent intent—that PVP causes flaking; that cosmetic scientists at Henkel knew about this characteristic of PVP; that these scientists, or others at Henkel with whom the scientists shared their knowledge, intended to defraud consumers by labeling a flaking hair gel as one that creates "no flakes"; and that this intent could be imputed to Henkel.  The FAC's speculation does not support a strong inference of fraudulent intent.  The Court therefore dismisses the FAC's common law fraud claim.

### B.    Motion to Dismiss Claims for Injunctive Relief for Lack of Standing

Henkel argues that the FAC's claims for injunctive relief should be dismissed under Federal Rule of Civil Procedure 12(b)(1) for lack of standing.  *See* Def. Mem. at 16–18.  It argues that Duran lacks standing because the FAC does not allege any real or immediate threat of future injury.  *Id.* at 16–17.  The Court holds with Henkel.

### 1.    Applicable Legal Principles

Under Article III, "a plaintiff must demonstrate standing for each claim and form of relief sought."  *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (quoting *Baur v. Veneman*, 352 F.3d 625, 642 n.15 (2d Cir. 2003)).  As a result, a plaintiff must demonstrate, with respect to injunctive relief, "the three familiar elements of standing: injury in fact, causation, and redressability."  *Id.* (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).  "Plaintiffs lack standing to pursue injunctive relief where they are they are unable to establish a 'real or immediate threat' of injury."  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111–12 (1983)); *see also Izquierdo*, 2016 WL 6459832, at *5.  Neither "allegations of *possible* future injury," nor "past exposure to illegal conduct" is sufficient to clear the standing bar for injunctive relief.  *Lugones*, 2020 WL 871521, at *6 (emphasis in original) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013);

24

*Lyons*, 461 U.S. at 102).   "There is no exception to demonstrating future injury when the plaintiff is pursuing a class action."  *Buonasera*, 208 F. Supp. 3d at 564 (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976)).  Rather, the "named plaintiffs must have standing in order to seek injunctive relief on behalf of the class."  *Id.*

### 2.  Application

The FAC has failed to allege a real or immediate threat of future injury.  Far from an immediate future injury, it alleges that if Duran were to encounter the Product again, he could not rely on the truthfulness of Henkel's representations unless corrective changes were made to the Product's packing, and that he would only purchase the Product if it had been re-engineered to be flake-free.  *See* FAC ¶¶ 18, 70.  Further, the FAC alleges, as to the purchase itself, that Duran would not have purchased the Product, especially not at its price, if he had known that it caused flaking.  *See id.* ¶¶ 7, 17.

These claims mirror others consistently rejected by other courts in this Circuit when considering a consumer's standing for injunctive relief after the purchase of a deceptively marketed product.  Alleging that one would purchase a product if re-engineered or re-marketed does not show a real or immediate threat of future injury.  *See, e.g.*, *Lugones*, 2020 WL 871521, at *6 (no standing where plaintiffs alleged that they would not purchase eggs unless defendant "change[d] its practices to mirror its advertising"); *Izquierdo*, 2016 WL 6459832, at *5 (no standing where plaintiff was "willing to purchase the current formulation" of candy if defendant "engages in corrective advertising").  Further, alleging that one would not have purchased a product but for defendant's misrepresentation is "effectively a concession that [plaintiff] does not intend to purchase the product in the future."  *DaCorta*, 2018 WL 557909, at *4 (no standing where plaintiff claimed that she would not have purchased boots "but for [defendant's]

25

misrepresentation of the former/original price"). The FAC thus clearly fails to allege that Duran has standing for an injunction.

Duran invokes public policy considerations in arguing that, in consumer fraud class actions, a party with standing for other forms of relief also has standing for an injunction; otherwise, he contends, no one will be able to sue for injunctive relief, because anyone duped by misleading product advertising is unlikely to buy that product again. *See* Pl. Mem. at 16–17. Some courts have adopted this position with regard to consumer protection statutes. *See Belfiore v. Proctor & Gamble Co.*, 94 F. Supp. 3d 440, 444–45 (E.D.N.Y. 2015) (citing public policy in holding that consumers who do not allege probable future injury have standing for injunctive relief under state consumer protection statutes); *cf. Petrosino v. Stearn's Prods., Inc.*, No. 16 Civ. 7735 (NSR), 2018 WL 1614349, at *5 (S.D.N.Y. Mar. 30, 2018) (holding plaintiff has standing if they assert that they will purchase product in future if ingredients are changed to match label). These few cases, however, are outweighed by the majority of precedent in the Circuit. *See Lugones*, 2020 WL 871521, at *6 (describing *Petrosino* as "outlier"); *Izquierdo*, 2016 WL 6459832, at *5 (explaining that *Belfiore* is not well settled in the Eastern District of New York and is not binding in this District). And, more importantly, public policy concerns cannot outweigh the requirement of Article III that plaintiffs must show a real or immediate threat of future injury. *See Lyons*, 461 U.S. at 111; *Nicosia*, 834 F.3d at 239.

The Court therefore dismisses the FAC's claims for injunctive relief for lack of standing.

### C.     **Motion to Strike Class Claims**

The FAC brings a putative class action, under Federal Rule of Civil Procedure 23, on behalf of all those who purchased the Product in the United States during the applicable limitations period, "and/or such subclasses as the Court may deem appropriate." FAC ¶ 48. In the alternative, the FAC proposes that the class include only those who purchased the Product in

New York state.  *Id.* ¶ 49.  Henkel moves to strike these class claims, arguing that the class

members do not have standing and that the class cannot satisfy Rule 23.  *See* Def. Mem.

at 21–25.  The Court denies this motion, without prejudice to Henkel's ability at a later stage to

oppose class certification.

"In this Circuit, . . . '[m]otions to strike are generally looked upon with disfavor.'"

*Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 462 (S.D.N.Y. 2013) (quoting *Chen-Oster v.*

*Goldman, Sachs & Co.*, 877 F. Supp. 2d 113, 117 (S.D.N.Y. 2012)).  Motions to strike class

claims are particularly disfavored because they "require[] a reviewing court to preemptively

terminate the class aspects of . . . litigation, solely on the basis of what is alleged in the complaint

and before plaintiffs are permitted to complete the discovery to which they would otherwise be

entitled on questions relevant to class certification."  *Id.* (quoting *Chen-Oster*, 877 F. Supp. 2d

at 117).  District courts in this Circuit therefore generally defer such questions to the class

certification stage, when the court has a fuller factual record.  *See Winfield v. Citibank, N.A.*,

842 F. Supp. 2d 560, 573 (S.D.N.Y. 2012) (collecting cases).  Motions to strike, "however, 'may

be entertained if the inquiry would not mirror the class certification inquiry and if the resolution

of the motion is clear.'"  *Talarico v. Port Auth. of N.Y. & N.J.*, 367 F. Supp. 3d 161, 172

(S.D.N.Y. 2019) (citation omitted).

Henkel first argues that the class members do not have standing.  Although a member of

a certified class must have standing, *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264

(2d Cir. 2006), a court may defer analyzing the standing of class members other than named

plaintiffs until "after class certification where certification issues are 'logically antecedent' to

Article III concerns."  *Kassman*, 925 F. Supp. 2d at 461 (internal quotation marks and citation

omitted); *see also Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 65 (2d Cir. 2012) (explaining that

"logically antecedent" refers to cases where resolution of class certification issue is dispositive).

That analysis is properly deferred here.[7]

Henkel next argues that the proposed class cannot satisfy Rule 23, specifically its requirements of typicality, predominance, and the implied requirement of ascertainability. Rule 23(a) requires the class to satisfy the following: "(1) the class must be 'so numerous that joinder of all members is impracticable'; (2) there must be 'questions of law or fact common to the class'; and the class representatives must (3) have claims typical of the class claims and (4) be able to 'fairly and adequately protect the interests of the class.'" *Talarico*, 367 F. Supp. 3d at 172–73 (quoting Fed. R. Civ. P. 23(a)). Henkel's arguments on its motion to strike, however, "'mirror the class certification inquiry' and so are premature." *Id.* at 173 (quoting *Kassman*, 925 F. Supp. 2d at 462).

The FAC has not failed to state a plausible claim of relief for a putative class.[8] *See id.* It has alleged, in detail, how the putative class is consistent with Rule 23's requirements. *See* FAC

---

[7] Even if the standing analysis were not deferred, Henkel's argument that not all members of the proposed class—all purchasers of the Product—were injured because some of them appear satisfied with the Product is unlikely to succeed at this stage. For this argument, Henkel relies primarily on consumer satisfaction demonstrated in its exhibits containing full Amazon and Wal-Mart reviews, which it attached to the Smith Declaration. *See* Smith Decl., Ex. D (Amazon reviews), Ex. E (Wal-Mart reviews). While the Court, in resolving a Rule 12(b)(1) standing challenge, may consider materials extrinsic to the complaint that pertain to jurisdictional facts, these reviews do not suffice to show a lack of standing. *Fangrui Huang v. GW of Flushing I, Inc.*, No. 17 Civ. 3181 (PKC), 2019 WL 145528, at *3 (E.D.N.Y. Jan. 9, 2019). As explained *supra*, merely because some consumers say they are satisfied with certain characteristics of the Product does not mean they were not injured. Moreover, the eventual class, if certified, may not consist of all purchasers, as the FAC allows the Court to define subclasses "as the Court may deem appropriate." FAC ¶¶ 48, 49.

[8] Henkel does not move to strike the claims of those who purchased the Product outside of New York. *See Kassman*, 924 F. Supp. 2d at 469–70 (striking claims brought on behalf of people who did not live or work in New York). The Court thus does not consider, at this stage, whether the class is limited properly to New York purchasers.

¶¶ 51–60.  It has also alleged that class members were injured because they purchased the Product, at a premium price, as a result of the alleged misrepresentations on its label—a purchase they would not have made "had they known the truth."  FAC ¶ 7; *see id.* ¶¶ 3, 39–41.  The Court thus denies Henkel's motion to strike the class claims without prejudice to Henkel's right to renew these or similar arguments at the class certification stage.

## CONCLUSION

For the foregoing reasons, the Court denies Henkel's motion to dismiss Duran's GBL §§ 349 and 350 claims, but grants the motion as to the common law fraud claim and claims for injunctive relief.  The Court also denies, without prejudice, Henkel's motion to strike the class claims.

The Court will, by separate order, schedule an initial pretrial conference.  The Clerk of Court is respectfully directed to terminate the motions pending at dockets 16, 27, and 34.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: March 30, 2020
       New York, New York